Betty J. ARCHIE, as Special Administrator of the Estate of Rena M. DeLacy, Deceased, et al., Plaintiffs-Appellants,

v.

CITY OF RACINE, Ronald W. Chiapete, and George W. Giese, Defendants-Appellees.

No. 86–1783.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1986.

Decided July 14, 1987.

As Amended Aug. 10, 1987.

Rehearing En Banc Granted Sept. 8, 1987.*

* Opinion vacated. See 831 F.2d 152.

Curry First, Perry, First, Lerner & Quindel, S.C., Milwaukee, Wis., for plaintiffs-appellants.

Joseph E. Boyle, City Atty., Office of the City Atty., Racine, Wis., for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and WILL, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

In July 1984, Betty Archie, Special Administrator of the Estate of Rena M. DeLacy ("DeLacy"), and five other individuals [1] filed this complaint seeking $1,000,000 in compensatory and $1,000,000 in punitive damages from the City of Racine, Wisconsin, Ronald Chiapete, its Fire Chief, and George Giese, a Racine Fire Department dispatcher.[2] The complaint was brought under 42 U.S.C. § 1983 and claimed that defendant Giese twice failed to send a rescue squad to take DeLacy to a hospital and twice rendered improper medical advice, thus causing DeLacy's death from respiratory failure and violating the Fourteenth Amendment.

I

The case was tried to the court in September 1985 and resulted in the dismissal of the action. The district court's findings of fact and conclusions of law are reported in 627 F.Supp. 766 (E.D.Wis.1986). The uncontested facts and the district court's findings of fact show as follows:

Rena DeLacy was a black female, age 43. She lived alone in her Racine apartment and was visited by a long-time friend, Les Hiles, early on May 27, 1984. He noticed that DeLacy was having difficulty breathing and called the rescue squad of the Racine Fire Department at 7:19 a.m. Defendant Giese, age 36, was the sole dispatcher on duty at the time and had been employed by the Racine Fire Department since 1972 and as a dispatcher since March 4, 1980. In that year, he received 30 hours of job training before becoming a full-time telephone dispatcher.

The two conversations between DeLacy, Hiles, and Giese are reported verbatim in 627 F.Supp. at 767–68. The transcript shows that after Hiles called Giese at the fire department, Hiles explained that DeLacy could "hardly breathe" and was "hyperventilating" and needed to go to "the emergency ward" but was unable to walk and therefore needed the rescue squad. Hiles gave the address of DeLacy's apartment twice and said "I'll meet you out in front." *Id.* at 767. Giese asked to talk to DeLacy. Rena DeLacy took the telephone, said she had "hyperthermia," and reiterated that she was having "a hard time breathing." The sounds of her "heavy labored breathing" came through on the tape. *Id.* at 768. Instead of sending the requested rescue squad to her apartment or advising her to go to a hospital, Giese told DeLacy to get a paper bag and breathe into it to slow her breathing down. *Id.* In fact, after he told her, "Why don't you slow down just a little

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The other plaintiffs were Rena DeLacy's five surviving children. Betty Archie was her sister.

2. Additional defendants were Racine County and two of its officials but all three were dismissed by the trial court when plaintiffs rested their case, and plaintiffs do not appeal their dismissals.

bit and relax?" she asked whether this meant she should "stay in my own apartment?" and he said:

GIESE: Just relax and don't breath[e] like you're breathing.

DELACY: Okay.

GIESE: Do me a favor.

DELACY: Yes.

GIESE: Get, get a little paper bag.

DELACY: A little what?

GIESE: A paper bag.

DELACY: Paper bag.

GIESE: And put it over your mouth and breathe into that. That will slow your breathing down.

DELACY: Okay, thank you.

*Id.*

Hiles left DeLacy's apartment an hour later and returned at 3:00 p.m. Hiles telephoned the Racine Fire Department three minutes later to say that DeLacy was still hyperventilating and that he was "scare[d]." Dispatcher Giese again answered the call and Hiles told him that DeLacy had "tried the paper bag" and had "sat" in her apartment, yet still was having trouble breathing. Despite knowing that DeLacy's breathing troubles had continued for at least six hours—it was actually eight hours—and that his prior medical advice had proven ineffective, Giese repeated that DeLacy should breathe into a paper bag:

GIESE: Well, if she's hyperventilating, just, just have her do what I told you to do. She's going to have to breathe into that bag.

HILES: Yeah, but.

GIESE: Over her nose and her mouth and then slow her breathing down.

HILES: Listen to me now. Is there anything [to] do with the heart?

GIESE: No.

*Id.* Hiles asked whether this would "beat the heart out" and Giese said "No." Hiles then said "maybe it'll wear her heart out," but Giese again responded "No" and did not send the rescue squad. *Id.*

Hiles left the apartment but returned later that night and found DeLacy dead. He then summoned the police, resulting in the 12:32 a.m. arrival of Sergeant Michael Ackley, who noted that a hospital was only five or six blocks away and then telephoned a fire department dispatcher who "very seriously doubt[ed] ... they would not respond to the call[s]" from Hiles because the rescue squad "will respond to almost all calls for service irregardless [*sic*] of the frivolity of the alleged problem." Trial Tr. 14 and Exh. 1, at 3; 627 F.Supp. at 769. The trial court found that Sergeant Ackley "was immediately concerned that the situation had been handled inappropriately." 627 F.Supp. at 769.

An autopsy on May 28 revealed that DeLacy's death was from respiratory failure due to bilateral vesicular pulmonary emphysema with superimposed bronchopneumonia. *Id.* at 767. Hospitalization or administration of oxygen might have saved her life. Trial Tr. 56–57 (testimony of Dr. Baylon).

Giese admitted that this was the first time he had refused to send a rescue squad when requested. 627 F.Supp. at 770. He testified that this was also the first time he had instructed someone to breathe into a paper bag and that he did not normally tender medical advice. Giese Tr. 26, 29, 58–59, 60.

Defendant Fire Chief Chiapete testified that the policy of his department was always to send rescue squads in emergencies and that Giese should have done so here. A Racine ordinance gave the Fire Chief the responsibility to delineate calls to respond to and established, by custom and usage, rescue squad service in emergencies as a right bestowed upon Racine inhabitants. Trial Tr. 143–144 (testimony of Chiapete). His assistant testified too that the fire department policy was to send rescue units to all emergency calls. 627 F.Supp. at 769. After the tragic events of May 27, Fire Chief Chiapete conducted an official investigation into Giese's conduct and concluded that his decision not to send an ambulance was "an error of judgment" but was "honestly made." *Id.* A press release by Chiapete reconfirmed that it was the Racine Fire Department's policy to "never ... refuse to send our rescue units in known emergency situations." *Id.*

The findings made by the district court show that Giese was aware of DeLacy's need for emergency services. The court found that Giese "acknowledged that Hiles was coherent and DeLacy's voice showed that she was in distress." 627 F.Supp. at 770. Giese testified that he knew Hiles' calls were a request for emergency services. Giese Tr. 36–37, 60. The trial court concluded:

It is clear from listening to the tape that Hiles was anxious to get help for DeLacy. It is also clear when DeLacy spoke that she was in distress. In his testimony Giese acknowledged that he recognized the difficulty she was having. The sounds of her heavy labored breathing are heard on the tape.

627 F.Supp. at 768.

The district court found that at trial Giese could not explain why he had not sent the rescue squad or why on both occasions he merely told DeLacy to breathe into a paper bag. Id. at 770. Judge Evans explicitly rejected one possible explanation by finding that Giese did not refuse to send a rescue squad because DeLacy was a black woman. The judge found that there was no pattern of discrimination against blacks and that Giese "sent rescue squads regularly into the black community." Id. at 770, 773.

The reason why Giese refused to send an ambulance is not clear. At trial, Giese's deposition was read wherein he testified that he had previously responded to requests for ambulance services made by Hiles and that the fact Hiles was the caller did not cause him to refuse to send an ambulance for DeLacy. Giese Tr. 24. Giese later changed his deposition answer by saying that in view of Hiles' reputation as a "nuisance," he did not send the rescue squad. Id. at 44–45. At trial he contradicted himself by first testifying that Hiles sounded "rational" and agreeing that DeLacy "talked in a manner which corroborated Mr. Hiles' statement she was having

trouble breathing," id. at 24–25, and then, upon cross-examination by his own attorney, testifying that Hiles "sounded intoxicated" and the calls were "getting too casual," id. at 48, 54. Later, he admitted on redirect examination that he did not believe that DeLacy's breathing problem was a "casual situation" and that when questioned by the police about DeLacy's death he did not mention that the "conversation got out of hand" or was too "conversational." Id. at 61.

Not surprisingly, the district judge found "absurd" that Giese's refusal to send the rescue squad could be justified because Hiles was the caller. 627 F.Supp. at 770. As to Hiles, he added:

[O]n the tapes he is lucid; it is clear what he wants; his voice reflects the urgency of the situation. At trial he was articulate and perfectly capable, in my view, of judging when an emergency would exist, and also perfectly capable of describing it. In addition, it should be noted that, with no difficulty, the Racine Police Department responded to his call regarding DeLacy's death.

Id. at 771. On the basis of the testimony and deposition, Judge Evans concluded, "Giese has no consistent explanation for his action or, more appropriately, his failure to act." Id. at 770.[3]

II

After rendering the foregoing findings of fact, Judge Evans dismissed the City of Racine and Fire Chief Chiapete under Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 and City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791. We agree that their dismissal was appropriate. There is no respondeat superior liability under § 1983. Monell, 436 U.S. at 691, 98 S.Ct. at 2036. Therefore Chiapete can only be held liable for his own actions and the City

3. The district judge's conclusion that Giese's explanation based on the fact that Hiles was the caller was "absurd" could mean that Giese was actually motivated by dislike, distrust, or malice towards Hiles but that this was not a reasonable

justification for his actions. Whether Giese was motivated by ill will or plain arbitrariness, his conduct under the facts of this case could be found to be an unconstitutional abuse of power. See infra Part III.

for its own ordinances, customs, or usages which subjected DeLacy or caused DeLacy to be subjected to a violation of her constitutional rights. Here the district court found that Chiapete "had no personal involvement in the incident," 627 F.Supp. at 771, and plaintiffs do not contest this finding. The court also found that it was the City's policy under ordinance and usage (established by Chiapete) to respond to " 'all emergency calls.' " *Id.* at 769. Plaintiffs contend that Chiapete failed to train the dispatchers adequately on what constituted an "emergency call;" however, a single incident caused by a non-policymaker such as Giese is insufficient to prove the existence of a policy of inadequate training. *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436–37 (plurality opinion). Chiapete and the City are not liable under § 1983 because their acts and policies did not cause DeLacy to be subjected to a violation of her constitutional rights.

Plaintiffs place much reliance on the recent decision of *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452, which held that a municipality can be liable under § 1983 for actions taken by its employees pursuant to policies formulated by officials " 'whose acts or edicts may fairly be said to represent official policy' " and not just policies enacted by its legislative body. *Id.* at 1298–99 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38). The Court further held that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* 106 S.Ct. at 1299. In the present case, if Fire Chief Chiapete had taken Hiles' calls and refused to send an ambulance or had directed Giese to refuse to send an ambulance after being apprised of the circumstances, then municipal liability might have been appropriate under *Pembaur,* notwithstanding the prior City policy to the contrary. However, municipal liability is not proper in this case because Chiapete was not involved in the decision to deny rescue services to DeLacy, a decision which was solely made by dispatcher Giese, a non-policymaker.

Plaintiffs' final argument for municipal liability is that the district judge erred when he found that Giese did not act pursuant to a City policy or custom because Chiapete's behavior following the tragic events on May 27 proves otherwise. In *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985), certiorari denied, —— U.S. ——, 107 S.Ct. 1369, 94 L.Ed.2d 686, the court held that a policymaker's "subsequent acceptance" of his or her employees' reckless conduct which caused a constitutional violation is evidence that the employees acted pursuant to a municipal policy or custom. *Id.* at 170–72. There the police embarked on a wild chase and shooting spree which began when a motorist wanted for questioning failed to stop when signaled to do so and ended with what a jury found to be a reckless shooting of an innocent rancher who had driven towards the police cars to learn the reason for the commotion on the ranch. Despite the entire Borger police night shift of six officers participating in what the court described as an "incompetent and catastrophic performance," there were no reprimands, admissions of errors, official reactions suggesting that policy had been violated, or changes in policy. The court concluded that because "that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger." *Id.* at 171. In contrast, here Fire Chief Chiapete investigated the incident, began a review of discretion given to dispatchers, and publicly reaffirmed the City's policy never to refuse to send rescue units in emergency situations. 627 F.Supp. at 769. The district judge's finding that Giese did not act pursuant to a City policy or custom is not clearly erroneous because he could find that Chiapete's behavior did not amount to a subsequent acceptance of Giese's acts tending to show their congruence with City policy or custom.

## III

■ Our starting point for determining dispatcher Giese's liability [4] under the facts of this case is consideration of what the Supreme Court has termed the "two essential elements" of a § 1983 action: whether the conduct complained of (1) "was committed by a person acting under color of state law" and (2) "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 overruled in part on other grounds by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662. In the present case there is no dispute that plaintiffs have proved the first element. Defendants did not argue on appeal that Giese was not acting under color of state law, and, in fact, Giese's actions and failures to act were done under color of Racine ordinance, custom, and usage providing for Racine Fire Department rescue services. The crux of the present dispute is whether his conduct deprived DeLacy of her rights of life and liberty under the Due Process Clause of the Fourteenth Amendment.

■ Our cases recognize that in large part the Constitution only creates negative duties for state actors. *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982); *Walker v. Rowe,* 791 F.2d 507, 510 (7th Cir.1986), certiorari denied, —— U.S. ——, 107 S.Ct. 597, 93 L.Ed.2d 597. The Fourteenth Amendment prohibits states from depriving individuals of their life, liberty, or property without due process of law, but generally it does not create a judicially enforceable right to a minimum level of governmental services. The appropriate level of governmental services is a matter of legislative providence guided by the interaction of political forces, as it must be:

> Governments regularly sacrifice safety for other things. A city may decide to spend more money on parks or education and less on police, even though its officials know that the expenditure on police would reduce the cost of crime by more than the expenditure on the police. It may do this without answering in damages to people subsequently mugged in the parks.

*Walker,* 791 F.2d at 510. States are not the insurers of their citizens' safety and courts would be at a loss to decide when such a duty to provide services was discharged, given the many competing demands for the vast array of services that implicate interests of life, liberty, and property. We hasten to add that our recognition of the nonjusticiability of these issues

---

**4.** Although plaintiffs' complaint did not specify whether they were suing Giese in his personal or official capacity, contrary to defendants' arguments, the course of the proceedings, including the district court's decision, clearly indicates that Giese was sued in his personal capacity. See *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 ("In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of the proceedings' in such cases typically will indicate the nature of the liability sought to be imposed."); *Brandon v. Holt,* 469 U.S. 464, 469-71, 105 S.Ct. 873, 876-78, 83 L.Ed.2d 878. Official-capacity suits are merely another way of pleading municipal liability, and "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham,* 473 U.S. at 165-66, 105 S.Ct. at 3105. Therefore, liability in an official-capacity suit turns on the role of the municipality's policy or custom. *Id.* 473 U.S. at 166, 105 S.Ct. at 3105.

In the present case, plaintiffs' pretrial brief and brief on appeal predicate municipal liability only on the basis of Chiapete's actions as a policymaker and the City of Racine's policy. Plaintiffs' Pretrial Br. 2 n. 1, 17; Appellants' Br. 14, 44-47. Plaintiffs asked for a determination of "liability and a judgment" against Giese for his own actions, which is consistent with a personal-capacity suit. Plaintiffs' Pretrial Br. 18. Furthermore, the district court viewed Giese as being sued in that capacity. Despite concluding that Giese's actions were not pursuant to a municipal policy and dismissing Chiapete and the City, the judge then considered whether Giese's conduct, although contrary to policy, was sufficient to establish a constitutional violation. *Archie,* 627 F.Supp. at 771. If Giese had only been sued in his official capacity, the finding of no municipal policy or custom would have required his dismissal. See *Graham,* 473 U.S. at 165-67, 105 S.Ct. at 3105-06. Although we will "ordinarily assume" that an official has been sued in his official capacity and only in that capacity, *Kolar v. County of Sangamon,* 756 F.2d 564, 568 (7th Cir.1985), there is no need to invoke that assumption when the course of the proceedings clearly indicates otherwise.

is not acquiescence in a Hobbesian state of nature where criminals or madmen terrorize others with impunity. Section 1983 was enacted as part of the Ku Klux Act of 1871 in which Congress invoked its powers under § 5 of the Fourteenth Amendment to counter "the lawless conditions existing in the South in 1871." *Monroe v. Pape*, 365 U.S. 167, 174–78, 81 S.Ct. 473, 477–79, 5 L.Ed.2d 492 overruled in part on other grounds by *Monell*, 436 U.S. 658, 701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611. Besides the civil remedy presently codified in § 1983, Congress enacted criminal and civil remedies against conspiracies to violate constitutional rights, 18 U.S.C. § 241; 42 U.S.C. §§ 1985(3), 1986, and authorized the President to use the militia or "any other means" to suppress any unlawful combination or conspiracy that "so hinders the execution of the laws of that State, and of the United States within the State," that "any part or class of its people" is deprived of a constitutional right and the state authorities "are unable, fail, or refuse to protect that right," 10 U.S.C. § 333.

■ Although complaints about the level of governmental services are normally only concerns of the political branches, when a state actor is under a duty to dispense protective services undertaken by the state and does so in a manner that deprives a person of life, liberty, or property, the Due Process Clause is violated. The Supreme Court has recently considered what type of conduct constitutes a "deprivation" in Fourteenth Amendment usage in *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662, and *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677. In concluding that negligent conduct was insufficient to constitute an "abuse of power" violative of the Due Process Clause, the Court stated that "the word 'deprive' in the Due Process Clause connote[s] more than a negligent act." *Daniels*, 106 S.Ct. at 664.[5]

The Court reasoned that "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of governmental officials to deprive a person of life, liberty or property" and that the Due Process Clause was "'intended to secure the individual from the arbitrary exercise of the powers of government.'" *Id.* at 665 (emphasis in original) (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111, 117, 28 L.Ed. 232 and *Bank of Columbia v. Okely*, 4 Wheat. (17 U.S.) 235, 244, 4 L.Ed. 559).

■ Conduct of a person acting under color of state law that amounts to an "abuse of power" violates the Due Process Clause and is redressable in an action brought under § 1983. "'The touchstone of due process is protection of the individual against arbitrary action of government.'" *Daniels*, 106 S.Ct. at 665 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935). The Due Process Clause accomplishes this not only by requiring appropriate procedural protections but also by placing "substantive limitations upon state action." *Paul v. Davis*, 424 U.S. 693, 711 n. 5, 96 S.Ct. 1155, 1165 n. 5, 47 L.Ed.2d 405. These substantive limitations protect the individual against a state actor's conduct that "shocks the conscience" or "run[s] counter to fundamental notions of fairness." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183; *White v. Rochford*, 592 F.2d 381, 385 (7th Cir.1979). As the Supreme Court has recently stated: "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, *e.g.*, *Rochin* [*v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183], it serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels*, 106 S.Ct. at 665 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372).[6] Our conclusion in this case

---

**5.** The Court left open the question of whether negligent conduct might be enough to state a claim under a constitutional provision other than the Due Process Clause. 106 S.Ct. at 664.

**6.** When a § 1983 claim is based on a violation of substantive due process or an incorporated guarantee of the bill of rights, the plaintiff need

not exhaust state remedies. See *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172; *McNeese v. Board of Education*, 373 U.S. 668, 671–73, 83 S.Ct. 1433, 1435–36, 10 L.Ed.2d 622; *Monroe*, 365 U.S. at 183, 81 S.Ct. at 481 ("The federal remedy is supplementary to the state remedy, and the latter need not be first

is the same reached by the Court in *Monroe v. Pape*, that "Congress, in enacting [§ 1983], meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position." 365 U.S. at 172, 81 S.Ct. at 476.

■ We are mindful of the Supreme Court's admonition that "[§] 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433; *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (Fourteenth Amendment is not "a font of tort law."). Whether a particular state actor's conduct resulting in loss of life, liberty, or property amounts to a constitutional violation depends on the totality of the circumstances of a given case. *Gumz v. Morrissette*, 772 F.2d 1395, 1400 (7th Cir.1985), certiorari denied, — U.S. ——, 106 S.Ct. 1644, 90 L.Ed.2d 189; *Schillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981). In *Daniels v. Williams* the Court held that the negligent leaving of a pillow on the prison stairs, and in *Davidson v. Cannon* the simple forgetting about a prisoner's note recounting a threat the prisoner had received, did "not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent." *Davidson*, 106 S.Ct. at 670; *Daniels*, 106 S.Ct. at 665–66. The fact that a tortfeasor is a municipal employee is not sufficient to make his or her tort an abuse of power. *Baker*, 443 U.S. at 146, 99 S.Ct. at 2965. What is required is the exercise of state power in an arbitrary or

abusive manner given the circumstances of the case. For example, the Fourteenth Amendment is not implicated when a person is "negligently killed by a sheriff driving a government vehicle," *Paul*, 424 U.S. at 698, 96 S.Ct. at 1159. However, the unjustifiable exposure of a motorist to risk of physical injury from a high-speed car chase attributable to a police officer's intentional misuse of his vehicle to harass that motorist is a violation of due process. *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir.1986) (100–m.p.h. car chase of motorist by police who failed to identify themselves and drove an unmarked car created a jury question over abuse of power due to conduct that may have "crossed the constitutional line [making] their pursuit and harassment actionable under [§] 1983").

Decisions of this Circuit and others have held persons acting under color of state law liable for abuses of power that deprived individuals of life, liberty, or property. All agree that "[t]here is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law." *Bowers*, 686 F.2d at 618; see *Gumz*, 772 F.2d at 1399 and n. 3 (substantive due process excessive-force claim based on events surrounding an arrest); *Norris v. District of Columbia*, 737 F.2d 1148, 1150–52 (D.C. Cir.1984) (excessive non-lethal force used against pretrial detainee); *Johnson v. Glick*, 481 F.2d 1028, 1032–33 (2d Cir. 1973), certiorari denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (same). Although

---

sought and refused before the federal one is invoked."). The Court recently reiterated this principle in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 192–97 and n. 13, 105 S.Ct. 3108, 3114–22, and n. 13, 87 L.Ed.2d 126, where it held that first, the adequacy of state procedures for compensation is relevant to a takings violation because there is no takings violation if compensation is provided, and second, state administrative action challenged in a § 1983 action must be a "final" decision, but the Court stated that the decision did not change the holding of *Patsy* that a § 1983 litigant need not exhaust state remedial procedures. Thus, an inquiry into the adequacy of state remedies, required in proce-

dural due process challenges by *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 and *Parratt*, 451 U.S. at 543–44, 101 S.Ct. at 1916–17, is irrelevant in § 1983 actions alleging a violation of substantive due process. See *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 871–72 (7th Cir.1983); accord *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1499–1502 (11th Cir.1985) (*en banc*), certiorari denied, — U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 and — U.S. ——, 106 S.Ct. 1993, 90 L.Ed.2d 673; cf. *Daniels*, 106 S.Ct. at 665 (essence of substantive due process claim is that state action should not have been taken no matter the procedures employed).

of course not every battery constitutes a violation of liberty under the Due Process Clause, when a police officer strikes a non-interfering bystander to prevent him from photographing an arrest, an abuse of power claim can be brought. *Schillingford*, 634 F.2d at 266. A § 1983 action was successfully brought against a judge who ordered a sheriff to bring to him in handcuffs a coffee vendor and then conducted a psuedo-official inquisition, all because the judge disliked the coffee, *Zarcone v. Perry*, 572 F.2d 52 (2d Cir.1978), and against a judge who physically ejected from his courtroom and assaulted a non-lawyer advocate, *Gregory v. Thompson*, 500 F.2d 59 (9th Cir.1974). Similarly, this Court upheld a § 1983 action against a state judge who abused his official power by acting as a prosecutor and filing criminal charges, forging the plaintiff's signature on a guilty plea and jury waiver form, and then having the plaintiff brought before him with the expectation of imposing an unconstitutional conviction, thus violating *inter alia* the plaintiff's due process right to a disinterested judge and Sixth Amendment right to counsel and a jury trial. *Lopez v. Vanderwater*, 620 F.2d 1229, 1235–37 (7th Cir. 1980), certiorari dismissed, 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491. Finally, in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), we held that police officers could be sued under § 1983 for recklessly exposing children to danger by leaving them in a car on the freeway after lawfully arresting their guardian for drag racing. We stated that "the unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty" could amount to a violation of the Due Process Clause. *Id.* at 383.

The theory of liability common to all these cases is that an official's deliberate misuse of state power resulting in an infringement of a constitutionally protected right or interest is actionable under § 1983. For example, the Tenth Circuit has held that some malicious prosecutions can violate the Constitution and not just the common law:

> [I]f the misuse of the legal procedure is egregious there may be a deprivation of constitutional dimensions for which a plaintiff can invoke § 1983.... We believe that when private parties or public officials use criminal complaints to coerce a release of civil liability from injured persons, this action, as a malicious prosecution, is egregious and qualifies as a deprivation of due process that violates the Fourteenth Amendment.

*Lusby v. T.G. & Y. Stores*, 749 F.2d 1423, 1431 (10th Cir.1984), vacated in part on other grounds and remanded, 106 S.Ct. 40, and certiorari denied in part, 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53, reaffirmed by 796 F.2d 1307 (10th Cir.1986), certiorari denied, —— U.S. ——, 107 S.Ct. 275, 93 L.Ed.2d 251; see *Conway v. Village of Mount Kisco*, 758 F.2d 46, 48 (2d Cir.1985), certiorari dismissed, 107 S.Ct. 390, 93 L.Ed.2d 325; *Norton v. Liddel*, 620 F.2d 1375, 1378 (10th Cir.1980); *Hampton v. City of Chicago*, 484 F.2d 602, 609–10 (7th Cir.1973), certiorari denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471. An abuse of power claim was also upheld against local officials and a city accused of using eminent domain powers with no intent to condemn but instead to coerce a private property owner to sell his property to an entity that was not a party to the condemnation proceedings. *Suthoff v. Yazoo County Indus. Dev. Corp.*, 637 F.2d 337 (5th Cir. 1981), rehearing denied, 642 F.2d 822 (5th Cir.1981) certiorari denied, 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 316. The Fifth Circuit rejected defendants' arguments based on *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, that this claim should only be redressable as a common law tort:

> [T]he tort alleged, if such it be, was accomplished by an abuse of governmental power sufficient " 'to raise an ordinary tort by a government agent to the stature of a violation of the Constitution.' " ... [A]llegations that an individual's property rights have been damaged, through a municipality's arbitrary misuse of instituted but abandoned state-law expropriation proceedings, adequately state a claim of deprivation of property

without due process of law in violation of the federal constitution.

*Suthoff,* 637 F.2d at 340 (quoting *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980), certiorari denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391).

█ The abuse of state power violates the Fourteenth Amendment and this is no less true when the misuse is a deliberate refusal to furnish a state-provided service. The Supreme Court has indicated that § 1983 applies to denials of state protective services:

> While one main scourge of the evil—perhaps the leading one—was the Ku Klux Klan, the remedy created was not a remedy against it or its members but against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law.

*Monroe,* 365 U.S. at 175–76, 81 S.Ct. at 478 (emphasis in original) (footnote omitted). The First Circuit in *DiMarzo v. Cahill,* 575 F.2d 15 (1st Cir.1978), certiorari denied, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320, similarly interpreted § 1983 based on *Monroe:*

> [T]he Civil Rights Acts of 1871 were intended to safeguard constitutional rights which state authorities might deny by neglecting to enforce state statutes as well as by more affirmative action.... Failure to act where there is a duty to act can give rise to an actionable claim under [§] 1983.

*Id.* at 18 n. 3. The day has long since passed to argue that unconstitutional conduct is only actionable under § 1983 upon a showing of class-based discrimination or racial animus. See *Joseph v. Rowlen,* 402 F.2d 367, 369 (7th Cir.1968); *Cohen v. Norris,* 300 F.2d 24, 29–30 (9th Cir.1962) (*en banc*). It is sufficient that the official unnecessarily, unjustifiably, and arbitrarily acts or violates a duty to act under state law and that such a reckless or intentional act or failure to act has the natural and foreseeable consequences of causing a deprivation of a constitutional right. See *Monroe,* 167 U.S. at 187, 81 S.Ct. at 484. The protection of the individual from just such arbitrary exercises of state power is the essence of due process. See *Daniels,* 106 S.Ct. at 665.

█ It is inconsistent with notions of fundamental fairness and due process for a state actor, consciously indifferent to the repercussions of his or her decision, to single out one individual for a denial of state-provided services. Plaintiffs contend that the Equal Protection Clause was also violated by Giese when he arbitrarily singled out DeLacy for treatment different from that given all others requesting municipal ambulance services.[7] They rely on *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265, where six Justices agreed that the denial of a state-created benefit of an administrative remedy for physical-disability discrimination to one claimant solely because the state agency failed to process the claim on time was arbitrary and failed a rational basis standard of review under the Equal Protection Clause. *Id.* at 441–42, 102 S.Ct. at 1160–61 (separate opinion of Blackmun, J.); *id.* at 444, 102 S.Ct. at 1162 (Powell, J., concurring in judgment). Because the fundamentals of equal protection including the proscription of arbitrary treatment are embodied in the guarantee of due process, see *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884; *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 174–79, 101 S.Ct. 453, 459–61, 66 L.Ed.2d 368 we need not decide if Giese's possibly reckless and arbitrary refusal to provide municipal ambulance services also violated the Equal Protection Clause. In the present case it is no less offensive to notions of due process that a state-created benefit of ambulance services was denied for no articulable reason at all by a state actor who was consciously indifferent to the known substantial risks.

Our conclusion is supported by *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972), in which

---

**7.** Plaintiffs contend that the district court erred in holding that Giese's refusal to send an ambulance was not due to the fact that DeLacy was black. This factual finding was not clearly erroneous; it was supported by evidence that Giese "sent rescue squads regularly into the black community." *Archie,* 627 F.Supp. at 773.

this Court held that police officers who stood by and watched other police officers beat a person in a public place could be held liable under § 1983 for their failure to act. Although the plaintiff alleged that the officers' failures to act were negligent or intentional, their conduct had to be at least reckless because the officers witnessed the beating and knew that it was illegal. We stated:

> We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace.

*Id.* at 11. We followed *Byrd* in our later case of *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979), reversed in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (*per curiam*), holding that a jury could find police officers liable for "failing to assist or protect the wounded occupants" of an apartment from the beatings and abuse that followed a shootout, stating that the fact that some police officers "did not personally participate in the abuse, but instead callously chose to watch, would not preclude their liability." *Id.* at 626; see *Maclin v. Paulson*, 627 F.2d 83, 86 (7th Cir.1980) (police chief could be liable for being present, yet not intervening, when his officers beat a pretrial detainee).

We recently reaffirmed the holding and reasoning of *Byrd* in *Rascon v. Hardiman*, 803 F.2d 269, 276–77 (7th Cir.1986), noting that "[t]he reasoning of the *Byrd* court has been adopted by other courts considering an officer's duty to intervene" and that we found "no cases rejecting this reasoning."

*Id.* at 276. The Eleventh Circuit has followed our cases and held that police officers who watched other officers use excessive force by dragging a wounded, handcuffed suspect from his car could be held liable under § 1983 because "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441–42 (11th Cir.1985); see *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986). The Fifth, Sixth, Eighth, and Tenth Circuits have also followed our decision in *Byrd*, holding police officers liable for violating a state law duty to act to prevent an illegal beating. *Ware v. Reed*, 709 F.2d 345, 353 (5th Cir.1983); *Bruner v. Dunaway*, 684 F.2d 422, 425–26 (6th Cir.1982), certiorari denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014; *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir.1983); *Putman v. Gerloff*, 639 F.2d 415, 423–24 (8th Cir.1981); *Lusby*, 749 F.2d at 1433 (10th Cir.1984); see *Armster v. City of Riverside*, 611 F.Supp. 103, 107 (C.D.Cal.1985) (police officer can be liable under § 1983 for failure to act to prevent beating by citizens making a citizen's arrest because "a police officer has a duty to intercede to prevent an individual from being subjected to excessive, unlawful physical force regardless of who is applying the unlawful force to the individual"); *Wilkinson v. Ellis*, 484 F.Supp. 1072, 1085 (E.D. Pa.1980) (prosecutor who failed to intervene to prevent police beating during interrogations could be liable under § 1983 for violation of state common law duty to uphold the law as a quasi-judicial officer).

Implicit in the *Byrd* line of cases is the recognition that when a state actor is under a duty to use state power under state law and recklessly and arbitrarily refuses to exercise it, resulting naturally and foreseeably in a loss of life, liberty, or property, a violation of due process is made out. The duty of a state actor to employ state power in a non-arbitrary manner is founded on the Due Process Clause, but the state power and duty to act are based

on state law. The existence of a state law duty to act distinguishes one person's failure to act from everyone else's failure to act, and the deliberate refusal to exercise the concomitant state power is the state action implicating the Due Process Clause.

The First Circuit has looked to state law in § 1983 actions to determine whether the state actor is under a duty to act. In *DiMarzo v. Cahill*, 575 F.2d 15 (1st Cir. 1978), certiorari denied, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320, the court held that the Commissioner of Corrections could be held liable under § 1983 for a "pervasive failure" to carry out his duties under Massachusetts law because "[a] natural consequence of [his] failure to comply with his statutory duties to promulgate and enforce minimum standards is that conditions would fall below a constitutionally allowable limit." *Id.* at 17–18.[8] In the later case of *Clark v. Taylor*, 710 F.2d 4 (1st Cir.1983), the First Circuit upheld a jury verdict under § 1983 against a warden, holding that the warden had a statutory duty under Rhode Island law "to protect the safety and well being of plaintiff [(a prisoner)] and that his failure to intervene to prevent the [carcinogenic] benzidine test reflected a reckless and callous indifference to plaintiff's safety." *Id.* at 9. The court held that it was irrelevant that the warden did not know the test was being performed by the state police whom he did not exercise control over because the plaintiff was "visibly upset" and the warden's "failure to inquire as to what was being done to the inmates or to respond to plaintiff's request for a lawyer evidenced a breach of his duty of care and a reckless and callous indifference to plaintiff's safety." *Id.* at 10.[9]

In the present case, plaintiffs proved that Giese had a duty under state law to send an ambulance if one were available. The district court's findings show that pursuant to Racine Municipal Ordinance 5.11.-020 and custom and usage established by the Fire Chief as a policymaker "the verbal policy of the Fire Department was to send rescue units to all emergency calls." 627 F.Supp. at 769. Fire Chief Chiapete reaffirmed that this was the policy in his press release following DeLacy's death. *Id.*

Given this duty to act under state law, if Giese exercised state power in a reckless and arbitrary manner causing DeLacy's death, a violation of due process would be shown. Here the district court's findings of fact could support a conclusion that Giese acted at least recklessly and arbitrarily, if not intentionally, in twice re-

8. Our holding that a state official can be liable under § 1983 for conduct that amounts to an abuse of state power is consistent with *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67. In *Pennhurst*, the Court held that a federal court lacks jurisdiction to enjoin state officials from violating state law, but it remanded the case to determine if the state officials' conduct violated the Constitution, including the Due Process Clause. *Id.* at 124–125, 104 S.Ct. at 920–21 and n. 35 (citing *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28). In *DiMarzo* the First Circuit held that the official's failure to carry out state law duties resulted in prison conditions below the constitutional minimum and not just violative of state law minimums. Similarly, since we hold *infra* that the district court could find that dispatcher Giese's conduct amounted to an abuse of power, his § 1983 liability would be based on his unconstitutional exercise of state power and not merely on his violation of state law or a common law duty of care.

9. *DiMarzo* and *Clark* are distinguishable from the later First Circuit case of *Estate of Gilmore*

*v. Buckley*, 787 F.2d 714 (1st Cir.1986), certiorari denied, —— U.S. ——, 107 S.Ct. 270, 93 L.Ed.2d 247. There it was held no § 1983 action was stated where state officials released a mentally ill convict on a two-day furlough and he subsequently murdered a person whom at least some of the defendants knew or should have known was a potential target of the convict. The court stated: "We also note that the plaintiff has failed to cite any provisions of state law that either imposed a constitutionally cognizable duty on the defendants to protect Gilmore, or afforded her an entitlement to protection." 787 F.2d at 722 n. 14. In *DiMarzo* and *Clark* such "constitutionally cognizable dut[ies]" existed under state law, and the reckless and arbitrary exercise of state power resulted in the constitutional violation. Unlike the present case, the facts of *Estate of Gilmore* suggest an administrative cross-up in which important information was apparently not available to the persons making the furlough decision, 787 F.2d at 718, and not a reckless and arbitrary exercise of state power amounting to an abuse of power.

fusing to send an ambulance. The district court found that Giese knew the situation was serious and that an ambulance was twice requested, 627 F.Supp. at 768, yet in dealing with DeLacy, he refused to send an ambulance and instead instructed her to breathe into a paper bag. The district court found that Giese had no articulable reason for his actions. *Id.* at 770. The district court's finding that his only proffered reason was "absurd" is not clearly erroneous, given Giese's numerous inconsistent statements during the course of this litigation, see *supra* at p. 484, and the district court's finding that "on the tapes [Hiles] is lucid; it is clear what he wants; his voice reflects the urgency of the situation." *Id.* at 771; see *id.* at 770 ("[Giese] acknowledged that Hiles was coherent and DeLacy's voice showed that she was in distress."). His testimony ruled out other possible justifications for his actions, such as Hiles' and DeLacy's use of the terms "hyperventilation" and "hyperthermia" caused him to think the condition was not serious or the call appeared to be a request only for transportation and not for emergency services or the unavailability of ambulances caused him not to send one. Giese Tr. 28–29, 36–37, 48, 50. Had only one phone call requesting emergency services been made, it would be a more difficult question whether the evidence was sufficient to allow the trier of fact to conclude that Giese exercised state power in a sufficiently abusive manner to raise what would be an ordinary tort to constitutional dimensions. However, his refusal to send an ambulance (when under a duty to do so) after two separate calls and after being told that his unsolicited "medical" advice had proven futile could be found to be sufficiently egregious to implicate due process guarantees against arbitrary state action. The fact that "he had never before decided not to send an emergency vehicle when one was requested," *id.* at 770, strengthens rather than undercuts our conclusion that the district court could find his conduct on this occasion implicated due process concerns of fundamental fairness and equal protection.

In sum, the evidence presented at trial and the district court's findings of fact could support a finding that Giese who was under a state duty to act exercised state power in at least a reckless and arbitrary fashion because he twice refused to send an ambulance for no articulable reason in conscious disregard of a substantial risk. The district court did not address this issue because it erroneously thought that no denial of state services could ever be actionable under § 1983. On the record before us, we cannot determine that as a matter of law an actionable abuse of power occurred. It requires an understanding of the totality of the circumstances of the case, see *supra* at p. 488, in order to distinguish abusive denials of state services from denials that are merely the product of exercises of poor judgment or incompetence, for the Constitution does not provide a remedy for merely tortious conduct. Remand is needed to allow the district judge to determine (based on further fact-finding to the extent he feels is necessary) whether Giese's conduct crossed the line from tort to constitutional violation. To find liability, the trier of fact on remand will have to determine that Giese had reason to foresee that there was a substantial risk that DeLacy might die or suffer grievous harm if rescue services were withheld and that he deliberately and consciously imposed such a risk on DeLacy. Further, it will have to be found that Giese refused to carry out his state-law duty to act and thus created this grave risk for illegitimate reasons such as malice or arbitrariness but not because of an honest error or mistaken judgment. The trier of fact should also consider Giese's actions of assuming control over DeLacy—by offering facile medical advice and telling her to remain in her apartment—as additional evidence of a possible abuse of power. See *infra* Part IV. Finally, if the trier of fact determines that an abuse of power occurred here, then it will have to determine whether the abuse of power caused DeLacy's suffering and death. See *infra* Part V. We have previously observed that liability under § 1983 should not "turn on the tenuous metaphysical construct which differentiates sins of

omission and commission," *White v. Rochford*, 592 F.2d at 384 (footnote omitted), and the important inquiry under the Due Process Clause is not whether the conduct can be characterized as an action or failure to act or as creating a special relationship but rather whether in light of all the circumstances the conduct constitutes an abuse of power. Our prior cases attest to the fact that plaintiffs here face a difficult task, but the totality of the circumstances of this case is such that an abuse of power could be found.

Tortious conduct is an unavoidable facet of human activity and its presence in the provision of state services, though unfortunate, is not surprising. It is very difficult to distinguish between a negligent or merely reckless denial of state-provided services—including one characterized by abysmally poor judgment and blatant irresponsibility—and a denial that rises to the level of an unconstitutional abuse of power. But when an act or failure to act implicates constitutional concerns over the relationship between the individual and the state, the real need not to trivialize the Due Process Clause by making it a "font of tort law" should not become an excuse for leaving unredressed abuses of state power and in turn trivializing the Constitution. In cases such as the present one, when the state actor fails to act rather than acts and is not a traditional wielder of state power, like a police officer, the distinction between common law tort and abuse of power is even murkier, yet the difficulty of the task is an unsatisfying retort to Congress' plain command in enacting § 1983 that federal courts be available to redress constitutional violations.

Today's decision is consistent with our earlier cases considering liability under § 1983 for a failure to act. In *Beard v. O'Neal*, 728 F.2d 894 (7th Cir.1984), certiorari denied, 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48, we decided that an undercover FBI informant was not liable for failing to prevent a police officer, who was also a hit man, from committing a murder. We held that the informant did not have a duty to act and thus his inaction did not cause the victim's death. *Id.* at 899–900. Unlike police officers who have a state-law "duty to enforce the laws and preserve the peace," *Byrd*, 466 F.2d at 11, nothing in *Beard* indicates that the informant was an officer of the law and charged with upholding it under any state or federal law or custom. Furthermore, the informant's failure to act may not have been "reckless and arbitrary" given his "fear for his safety and loss of his guise." 728 F.2d at 898. In contrast, it is Giese's state-law duty to dispatch ambulances in emergencies and it is his possible abuse of this state power in contravention of the Fourteenth Amendment that could make his failure to act (as opposed to that of any other state employee or member of the general public) actionable under § 1983. The evidence in this case is sufficient for the trier of fact to find that Giese abused his state power, but nothing in *Beard* established that the informant had state power and a duty to act, let alone abused it.

Today's decision does not depart from decisions which have held that state actors cannot be held liable under § 1983 for failing to provide the community with an adequate level of protective services. For example, in *Jackson v. Byrne*, 738 F.2d 1443 (7th Cir.1984), we held that the failure of the City of Chicago to provide for adequate fire protection during a firefighters' strike was not an abuse of power but rather a nonjusticiable political question. In general the Constitution does not create a duty on the part of the state to provide a minimum level of services, see *supra* at pp. 486–87, but it does require that a state actor under a state duty to dispense allocated services does not recklessly and arbitrarily withhold them from a particular person or class of persons. Similarly, the plaintiffs' complaint in *Jackson v. Byrne* based on the police preventing striking firefighters from gaining access to equipment in a locked fire station really was a complaint about the amount of equipment supplied by the city—a nonjusticiable political allocation decision. The police officers did not abuse their power; they carried out

their duty to enforce the laws and policies of the city.[10]

Our decision today is also consistent with *Jackson v. City of Joliet*, 715 F.2d 1200 (7th Cir.1983), certiorari denied, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720, where we held that police officers could not be held liable under § 1983 when they directed traffic around a burning car but, allegedly out of gross negligence, failed to check the burning car to see if there were any occupants who could be saved. We recognized that some failures to act may amount to an abuse of power:

> It would be a different case if intentional misconduct were alleged; we may assume that if officer Taylor, knowing the car was occupied and wanting the occupants to be burned to death, directed traffic away from the scene in order to prevent any passing driver from saving them, he would be liable under [§] 1983 for having under color of the city ordinance making him a public officer deprived the plaintiffs' decedents of their lives without due process of law.

*Id.* at 1202. Similarly, a claim under § 1983 would be stated if the police officer knew that occupants were in the car and could be saved while exposing himself to no risk of serious injury, yet decided not to carry out his duty to rescue them for no reason at all. However, nothing in the facts of *Jackson v. City of Joliet* suggested that the police officer and firefighters made deliberate, reckless decisions to deny arbitrarily the benefits of state power to a particular individual. There was no abuse of power actionable under § 1983.

The recent decision of *DeShaney v. Winnebago County Department of Social Services*, 812 F.2d 298 (7th Cir.1987), is not to the contrary. It held that a complaint failed to state a § 1983 claim when it alleged that a welfare agency caseworker recklessly failed to discover that a child was being abused and to recommend his removal from the household. However, the county agency had earlier determined (after apparently careful consideration) that there was insufficient evidence to establish probable cause that the child would be abused if not kept in the custody of the court. *Id.* at 299–300. Subsequently the court closed the case the agency had brought, over a year before the beating that severely injured the child. *Id.* at 300. Furthermore, although the caseworker was aware of suspicious injuries during the year between the closing of the case and the child's severe beating, she had met with the parents but did not see the child for the final three months prior to the beating. *Id.* The caseworker did not know the child was being abused and had an important reason for not removing the child absent this knowledge: she and her agency could be liable under state and federal law for improperly terminating parental rights. *Id.* at 303, 304. Given this weighty interest counseling against removal of the child, the caseworker's conduct was not arbitrary and did not amount to an abuse of power.

*DeShaney* makes clear that not all reckless conduct by state actors rises to the level of a constitutional violation. In this sense, *DeShaney* is similar to *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251, in which the Court held that

**10.** Some of our other cases are distinguishable on the same basis as *Jackson v. Byrne.* In *Ellsworth v. City of Racine*, 774 F.2d 182 (7th Cir.1985), certiorari denied, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574, no state actor breached a Fourteenth Amendment duty not to exercise state power recklessly and arbitrarily: the city did not provide special police protection on the night of the attack to the family of an undercover officer who was the target of threats because the victim had told the assigned police officer it was not necessary for him to stay, *id.* at 186 (Coffey, J., concurring), and no complaint could be based on the general level of police protection provided by the city, *id.* at 185. Similarly, our cases of *Walker v. Rowe*, 791 F.2d 507 (7th Cir.1986), certiorari denied, —— U.S. ——, 107 S.Ct. 597, 93 L.Ed.2d 597, and *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), stand for the principle that the Due Process Clause does not require the state to provide a minimum level of protective services, including safe working conditions for prison guards or protection against murders committed by parolees, even when the parole decision is recklessly made. In neither case did state officials under a duty to act fail to protect the victims because of a deliberate decision not to carry out their responsibilities in reckless disregard of a known substantial risk to the victims. The possible Fourteenth Amendment violation in this case was not present in those cases.

"deliberate indifference" to prisoners' safety did not violate the Eighth Amendment or the substantive provisions of the Fourteenth Amendment when prison officials acted in the face of a prison riot. 106 S.Ct. at 1084–85, 1088. The Court held that the deliberate indifference standard of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 "was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," 106 S.Ct. at 1084, but in the prison-riot context that standard does not adequately reflect the importance of competing obligations and the conditions under which the decision is made, *id.* at 1085. The caseworker in *DeShaney* had to temper her actions in light of the weighty parental interest; her failure to act after a court had closed the case because of insufficient evidence was not an abuse of power, especially where there was no new hard evidence. Thus, in contrast to the present case, in *DeShaney* it is unclear if there was a state law duty to act—the agency had closed the case over a year earlier—and the caseworker's conduct was not arbitrary and offensive to notions of fundamental fairness, given the strong countervailing interest. Dispatcher Giese, on the other hand, received two requests for ambulance services, had no reason for denying those services, knew DeLacy's breathing problem was serious and had continued for at least six hours, and knew he had always sent ambulances in similar circumstances and had never before instructed someone just to breathe into a paper bag; his actions and failures to act could be an abuse of power.

## IV

■ The present case fits within the "special relationship" rubric that allows recovery under § 1983 for certain denials of state services. The district court here reasoned that no special relationship existed between DeLacy and the City of Racine because the Racine ordinance guaranteed rescue services to all members of the public rather than just a particular citizen such as DeLacy. 627 F.Supp. at 772–73. As we have stated, generally a § 1983 action cannot be brought to challenge the level of services provided by the state, see *supra* at pp. 486–87; however, when a special relationship exists between the state and an individual the state may very well have a constitutionally cognizable duty to provide a minimum level of services. This Court has recognized that "a right and corollary duty to basic protective services may arise out of special relationships created or assumed by a municipality in regard to particular people." *Ellsworth v. City of Racine*, 774 F.2d 182, 185 (7th Cir.1985), certiorari denied, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574. The essence of the special relationship concept is that "when the state takes someone into its care or cuts off sources of private aid, the state must afford replacement protection." *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.1986), certiorari denied, —— U.S. ——, 107 S.Ct. 597, 93 L.Ed.2d 597.

■ When the state exercises actual control or custody over an individual it may have a constitutional duty to provide services. For example, the state has a duty under the Eighth Amendment not to be deliberately indifferent to prisoners' medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251; see also *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir.1985), certiorari denied, —— U.S. ——, 106 S.Ct. 1466, 89 L.Ed.2d 722 (state has duty under Eighth Amendment to protect prisoner from attack when guard "should have realized that there was a 'strong likelihood' of an attack"). In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, the Court held that under the Due Process Clause of the Fourteenth Amendment a state has "the unquestioned duty to provide reasonable safety for all residents and personnel within" state mental hospitals and that "the [s]tate is under a duty to provide [the patient] with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* at 324; see *id.* at 315–16, 319, 321–22; see also *Spence v. Staras*, 507 F.2d 554,

557 (7th Cir.1974) (state has duty to protect patient institutionalized in state facility from known risk of assault).

■ A special relationship between the state and a particular person can also arise where there is no actual control or custody by the state. A municipality that puts a person in a position of danger from private persons and subsequently fails to protect that person can be held liable under § 1983 for the resulting deprivation of life or liberty. *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). In *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), we held that non-institutionalized persons could recover under § 1983 for a due process violation when the state actors' conduct cut off their source of private aid. There three children were riding with their uncle on the Chicago Skyway when the uncle was arrested for drag racing. Despite the uncle's plea to take the children along to the police station or to a phone booth, the officers left the children behind in the car. The children had to wander along the highway in the cold to find a telephone and obtain rescue, by which time they had suffered emotional injuries and one child, an asthmatic, required hospitalization. This Court held that the officers could be liable for their grossly negligent or reckless conduct under § 1983, and thus made clear that a state may deprive a person of liberty by denying services although that person is not in the state's actual custody. What is necessary under this line of cases is that the state has exercised control over the person's movements or accepted responsibility for the person's care or cut off private sources of aid or markedly increased a particular person's risk of danger from others or in some other way assumed a special relationship with a particular person.

■ In the present case, the trier of fact could find the existence of a special relationship. The findings of fact by the district judge and the evidence presented at trial would support a conclusion that Giese deliberately assumed control over DeLacy's physical welfare. As already discussed, see *supra* at pp. 492–93, the trier of fact could find that Giese, acting recklessly and arbitrarily, dissuaded DeLacy from leaving her apartment and lulled her and Hiles into believing that nothing more need be done than for DeLacy to sit still and breathe into a paper bag. Their reliance on Giese's advice could be found foreseeable (as well as reasonable) because he acted with the apparent authority of a responsible municipal agency and was insistent that all DeLacy need do was to breathe into that paper bag. The fact that DeLacy and Hiles thanked Giese at the end of both conversations is evidence of their acquiescence and trust. Hiles' testimony also supports the view that Giese's unsolicited advice led Hiles and DeLacy to conclude erroneously that the problem was not serious and caused Hiles to leave without seeking other aid:

> I left, yeah, because they told her to take a paper bag and hyperventilate her. I said, "I'm not a doctor, I'm not a doctor, I don't know[.]" I said, "blow in that bag," and [she] kind of had a[—]I didn't know it, she didn't know it[—]she was having a heart attack [while] all the time breathing like that.

Trial Tr. 262. If Giese had failed to answer the phone or, having answered the phone, failed to send a rescue squad, DeLacy could have arranged for another source of aid in the hours she lay dying. A special relationship could be found based on Giese's exercise of constructive control over DeLacy, and his possibly reckless and arbitrary refusal to send an ambulance could violate the limitation on state action imposed by the Due Process Clause.

■ It is not merely coincidental that the facts of this case might establish a violation under a special relationship theory and an abuse of power theory. The special relationship line of cases is a subset of the abuse of power cases. In special relationship cases, the state actor has exercised his or her state power—even if he or she does so by refusing to act—in an unconstitutional manner, given the totality of the circumstances including the relationship between the state and the plaintiff. When a special relationship can be said to exist, a court is more likely to find that a failure to act

rises to the level of a constitutional violation because the state actor is on notice of the need to protect a particular person, as opposed to a member of the general public, and is less likely to have an adequate reason for failing to act. Similarly, the Eleventh Circuit has concluded that the nexus between the state and an individual captured by the phrase "special relationship" is particularly relevant because "the more important the relationship and its attendant duties, the more likely it is that an act or omission on the part of one party has the potential to deprive the other of a constitutional right." *Taylor v. Ledbetter*, 818 F.2d 791, 797–98 (11th Cir.1987) (*en banc*) (relying in part on special relationship theory to hold that a child placed in a foster home by the state could bring a substantive due process claim based on the state's reckless failure to protect the child from physical abuse).

There is no provision of the Constitution that addresses special relationships as such,[11] but there are provisions that regulate the manner in which state power can be exercised. One provision is the Due Process Clause of the Fourteenth Amendment. When a police officer guns down a person in circumstances not justifying the use of deadly force the abuse of power is obvious. Even though at first glance the abuse of power may be less apparent, certain failures to act by state actors can also violate the Due Process Clause and thus are redressable under § 1983. In the present case, the trier of fact could find that Giese's possibly reckless and arbitrary failure to act when under a state duty to act amounted to an unconstitutional abuse of power, given the totality of the circumstances of the case, including his exercise of constructive control over DeLacy. The inquiry upon remand of this case is whether such an abuse of power in fact occurred.

## V

Plaintiffs must prove a causal connection between DeLacy's death and Giese's unconstitutional conduct to prevail under § 1983. *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481; *Bass v. Wallenstein*, 769 F.2d 1173, 1182 (7th Cir.1985); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983). Here plaintiffs introduced expert testimony that De-Lacy's breathing problem was a "treatable medical condition," the minimum treatment—known for 25 years—for such a problem was applying oxygen, and that DeLacy did not die as a result of a disease which "was terminal irrespective of the type of medical attention she might have received." Trial Tr. 53–59 (testimony of Dr. Baylon); see *id.* at 64–65. Furthermore, testimony was given that a Racine rescue squad had on a previous occasion responded when DeLacy was having breathing difficulties and had placed an oxygen mask over her mouth during the trip to the hospital. *Id.* at 241–42, 243–44 (testimony of Cynthia DeLacy). Also, plaintiffs presented testimony that DeLacy or someone on her behalf had requested ambulance services on several occasions and that she had never refused or attempted to refuse or resist transportation by an ambulance. *Id.* at 333–34 (rebuttal testimony of Joseph Harris, Jr.).

Absent the presentation of contrary evidence by Giese, the evidence presented by plaintiffs would be sufficient to establish causation. For example, in *Bass v. Wallenstein*, 769 F.2d 1173 (7th Cir.1985), this Court held that evidence that a prisoner would have had "a 10–30% chance of survival" if a doctor had provided advanced cardiac life support was sufficient to support a jury verdict against a doctor who displayed deliberate indifference to a prisoner's medical condition by ignoring three calls informing him of the medical emergency while the prisoner lay dying and by not starting life support until the prisoner's condition was irreversible. *Id.* at 1178,

---

**11.** We previously made a similar observation in *DeShaney v. Winnebago County Department of Social Services*, 812 F.2d 298, 303 (7th Cir.1987). See also *Harpole v. Arkansas Dep't of Human Servs.*, 820 F.2d 923 (8th Cir.1987). But see generally *Taylor v. Ledbetter*, 818 F.2d 791, 797–98 (11th Cir.1987) (*en banc*) (applying special relationship theory to relationship between the state and a child it placed in a foster home).

1182–84. Similarly, the plaintiffs here presented evidence that DeLacy would have had an appreciable chance of survival because her condition was treatable and, in fact, had been successfully treated in the past with the aid of a Racine rescue squad, and thus Giese's possibly unconstitutional abuse of power may have caused DeLacy's suffering and death. Causation may even be stronger here than in *Bass v. Wallenstein* because the trier of fact could find that Giese's conduct, including the facile medical advice, caused DeLacy to remain in her apartment rather than go to the nearby hospital and caused Hiles to leave and not seek additional sources of aid for her. See *supra* at p. 497; see also *DeShaney v. Winnebago County Dep't of Social Servs.*, 812 F.2d 298, 303 (7th Cir.1987).

In *DeShaney* we approached the causation issue by asking what would have happened if the county agency had never existed. 812 F.2d at 302. We concluded that the caseworker's allegedly reckless failure to discover that a child was being abused and to remove him from his family did not cause the child's severe injuries, rather his father did. *Id.* at 302–03. As we have explained, there was no abuse of power in *DeShaney* because the caseworker may not have been under a duty to act and her failure to act was not arbitrary but rather was motivated by a sound reason, namely, the important interest in not unnecessarily interfering with the family unit. See *supra* at pp. 495–96. The absence of a constitutional violation in *DeShaney* distinguishes it from our prior decision of *Bass v. Wallenstein*, as well as the present case. When a plaintiff proves that an abuse of state power has occurred, it is improper to assume the non-existence of the unconstitutional conduct that naturally and foreseeably led to the victim's injuries. Here Giese's failure to act may have caused DeLacy's death because the trier of fact could find on remand that but for Giese's unconstitutional abuse of power, an ambulance would have been sent and DeLacy would have had an appreciable chance of surviving. See *Bass*, 769 F.2d at 1182–84.

## VI

The evidence presented at the trial of this case was sufficient to support a verdict that Giese's conduct amounted to an abuse of power violative of the Due Process Clause. Therefore, the district court's judgment in favor of defendant Giese must be reversed. The judgments in favor of defendants Chiapete and the City of Racine are affirmed. On remand, the district judge, who is sitting as the trier of fact in this case, should determine consistent with this opinion whether Giese's conduct was an unconstitutional abuse of power. The district judge should rely on the evidence presented at the prior trial, his previous findings of fact, and any new evidence which he may decide is necessary to his decision and directs the parties to present. Circuit Rule 36 shall not apply on remand.

Reversed in part and remanded for further proceedings consistent herewith.