**Betty J. ARCHIE, as Special Administrator of the Estate of Rena M. DeLacy, Deceased, Cynthia F. DeLacy, Marlon J. DeLacy, Darwin D. DeLacy, Veronica M. Brumsey, and Randall R. DeLacy, a minor, by Adrian P. Schoone, his Guardian ad Litem, Plaintiffs,**

v.

**CITY OF RACINE, Ronald W. Chiapete, George W. Giese, Defendants.**

Civ. A. No. 84–C–926.

United States District Court, E.D. Wisconsin.

Feb. 11, 1986.

Curry First, Perry, First, Reiher, Lerner & Quindel, S.C., Milwaukee, Wis., and Adrian P. Schoone, Schoone, McManus, Hankel,

Ware & Fortune, S.C., Racine, Wis., for plaintiffs.

Joseph E. Boyle, City Atty., and Mark Janiuk, Deputy Corp. Counsel, Racine, Wis., for defendants.

## DECISION AND ORDER

TERENCE T. EVANS, District Judge.

This case was tried to the court on September 24, 25, and 26, 1985. At the close of plaintiffs' case, defendants Racine County, John Esayian, and Herbert E. Johnson were dismissed from the suit. The following constitute my findings of fact and conclusions of law regarding the claims against the remaining defendants, the City of Racine, Ronald W. Chiapete and George W. Giese.

Three people play central roles in the tragedy that unfolded in Racine, Wisconsin, on May 27 and 28, 1984. First is Rena DeLacy, a black woman who died in her home in the early morning hours of May 28, 1984. At the time of her death she was only 43 years old, but her health was not good. The autopsy, performed by Dr. Victor Baylon, revealed the following conditions:

1. Moderate coronary arteriosclerosis.
2. Bilateral arterial nephrosclerosis.
3. Bilateral vesicular pulmonary emphysema.
4. Bilateral acute bronchopneumonia.
5. Bilateral pulmonary edema.
6. Severe fatty liver.
7. Severe fibrosis of pancreas.
8. Benign ovarian cyst.
9. Esophageal ulcer.

Dr. Baylon concluded that the cause of Ms. DeLacy's death was "respiratory failure due to bilateral vesicular pulmonary emphysema with superimposed bronchopneumonia."

The second major actor is Les Hiles, a man well known to some in the Racine community, and almost universally referred to as a "character." Hiles was with DeLacy the day before she died. He initiated two calls to the Racine Fire Department seeking rescue services.

Third is Giese, a dispatcher with the Racine Fire Department who took both of Hiles' calls, told DeLacy to breathe into a paper bag, and refused to send the rescue squad to her home.

A supporting minor part is played by Chiapete, the Racine Fire Chief, who was in charge of rescue services for the city.

The events of May 27 and 28, 1984, began at 7:19 a.m. when Hiles called for the rescue squad. The conversation was recorded, and is as follows:

GIESE: Fire Department, Giese.

HILES: Hi. Say, this is Les Hiles, and we have a lady that's really, aahhhhhh, I don't know, I'm not a doctor, hyperventilating. She can't hardly breathe, and I said, well, let's go down to the emergency ward. Say's, "I can't walk," Ahhhhhhh, so I says, well, I thought I could call rescue squad together, okay. 818 College Avenue

GIESE: What's the address?

HILES: 818 College Avenue. I'll meet you out in front.

GIESE: What's the problem with her?

HILES: She just don't—just breathing like, you know, she just can't get her breath or nothing.

GIESE: How old is she?

HILES: Ah, excuse me. Rena, how old are you? Forty-three.

GIESE: Let me talk to her, please.

HILES: Okay. Come here, come here. Wants to talk to you. She ain't big enough. Four hours don't people— (Makes sound of a person breathing very hard). See, I'm, I'm Les Hiles you know and I could be the best act in the world but—

GIESE: Let me talk to her. Put her on the phone.

HILES: She's coming. She ever gets here. I know what's wrong with her.

RENA: Hello.

GIESE: Hi, what's, what's, what's the problem?

RENA: Hyperthermia.

GIESE: Hyper what?

RENA: Thermia. Having a hard time breathing.

GIESE: Have you ever had this trouble before?

RENA: Once, once.

GIESE: Why don't you slow down just a little bit and relax?

RENA: And stay in my own apartment?

GIESE: Just relax and don't breath like you're breathing.

RENA: Okay.

GIESE: Do me a favor.

RENA: Yes.

GIESE: Get, get a little paper bag.

RENA: A little what?

GIESE: A paper bag.

RENA: Paper bag.

GIESE: And put it over your mouth and breathe into that. That will slow your breathing down.

RENA: Okay, thank you.

GIESE: Okay, bye.

RENA: Bye.

It is clear from listening to the tape that Hiles was anxious to get help for DeLacy. It is also clear when DeLacy spoke that she was in distress. In his testimony Giese acknowledged that he recognized the difficulty she was having. The sounds of her heavy labored breathing are heard on the tape.

Almost eight hours later, at 3:03 p.m. on May 27, 1984, Hiles again called the Fire Department. The conversation was as follows:

GIESE: Fire Department, Giese.

HILES: Hi, this is Les Hiles, Giese.

GIESE: Yeah.

HILES: Listen, this, this lady, ah, my little black girl friend, I, I called before and tried the paper bag. She's still hyper—how do you say that word, hyperventilating?

GIESE: M'hm.

HILES: But she sat here for six hours. I mean, did, and I asked, "Did you ever do this before? She said, (slurred words) only once in a while. But it scares me, you know, me.

GIESE: Well, if she's hyperventilating, just, just have her do what I told you to do. She's going to have to breathe into that bag.

HILES: Yeah, but.

GIESE: Over her nose and her mouth and then slow her breathing down.

HILES: Listen to me now. Is there anything do with the heart?

GIESE: No.

HILES: It isn't going to beat the heart out?

GIESE: No.

HILES: Cause I know ..... like my chest when ........ I'm talking. You know who I am. Les Hiles.

GIESE: M'hm.

HILES: The swimmer? Okay, what I thought, my God, man, maybe it'll wear her heart out.

GIESE: No.

HILES: No? Okay. Say, what's your first name?

GIESE: George.

HILES: Oh, thanks a lot.

GIESE: Okay.

HILES: Thank you very much.

GIESE: Yeah.

HILES: Bye.

Early on May 28, 1984, Hiles found De-Lacy dead, sitting in a chair in her apartment. He called the police and Sgt. M.S. Ackley was one of the officers who arrived at the scene to investigate. Ackley confirmed that DeLacy was dead and called the Coroner's Office.

Hiles told Ackley of his calls for the rescue squad. Before he left the scene, Sgt. Ackley called the Fire Department to check to see if the rescue squad had been called. His report as to what he learned is as follows:

It should lastly be noted that while the writer was at the home awaiting the arrival of the Assistant Deputy Coroner, I did make contact with the Racine Fire Department. I spoke with the third shift phone operator and advised him of the allegations made by MR. HILES. The

third shift dispatcher said that he had not talked with a day shift operator, but he would gladly check the log for rescue runs at that address. The day shift operator further stated they had no logs listing of run with a rescue at that address. The night shift operator stated he would recontact the day shift operator in the morning, and see if any such call did indeed come in. The midnight phone operator from the Fire Department did state that he very seriously doubt it that they would not respond to the call, as they will respond to almost all calls for service irregardless of the frivolity of the alleged problem.

Sgt. Ackley's testimony indicates that he was immediately concerned that the situation had been handled inappropriately.

The policy of the Racine Fire Department as to rescue calls, in Municipal Ordinance 5.11.020, is that the Fire Department answers all calls as delineated by the Chief or the Assistant Chief. Fire Chief Chiapete states that the Department answers "all emergency calls." No written statement exists as to what constitutes an emergency.

Chiapete testified at trial that Giese should have dispatched the rescue squad to DeLacy. Chiapete would have done so. But he also stated that he could understand how Giese came to a different conclusion.

Jeffrey G. Peterson, Assistant Chief of the Racine Fire Department in charge of training in May, 1984, stated that the verbal policy of the Fire Department was to send rescue units to all emergency calls. He also stated, in response to hypothetical questions, that a rescue squad should have been sent in a situation such as the DeLacy situation. According to Peterson, the only information it is necessary to give to the dispatcher is the address and the type of service required. The dispatcher likes to have the name of the person as well, in case the address given is incorrect.

An official investigation into Giese's conduct resulted in the following Press Release from Chiapete, which is quoted here in part:

Addressing the specific incident of May 27, 1984 my conversation with Pvt. Giese indicates to me that he came to the conclusion, based on the conversation with Ms. DeLacy and Mr. Hiles, that an emergency situation did not exist. My review of the tapes of those conversations indicates that his conclusion is not entirely unwarranted. It is my view that Pvt. Giese made a judgment call based on his present analysis of the conversations with the calling parties. I believe that his decision was honestly made and without any intent on his part to refuse service or harm any person.

In view of my analysis of the situation it is my present intention not to impose any disciplinary action on Pvt. Giese.

Viewing the entire situation from the perspective of hindsight, however, I believe that it may have been better judgment if Pvt. Giese had dispatched the rescue unit. Hindsight is, of course, always perfect, and it is difficult to say what any individual would or would not do at the time an incident arises.

At present my department does not have a written policy with respect to the discretion of dispatchers, and that matter is presently under review by Assistant Chief Jeffrey Peterson who recently assumed the duties of the department training officer.

The department naturally regrets the unfortunate death of Rena DeLacy but cannot assume responsibility for it. At worst, the department can be faulted for an error of judgment which we believe is understandable in view of the circumstances, and must be judged from the perspective of the thousands of calls received by our department each year, and the great number of persons who are helped by our rescue service. We have never refused and never will refuse to send our rescue units in known emergency situations.

Why did Giese decide not to send a rescue squad to the DeLacy home? Was it because Rena DeLacy was black? Was it because he didn't believe Les Hiles? Was

it because he didn't think a true emergency existed? The first question, from a constitutional standpoint, is the most important. The answer to it is "no". Giese specifically denied that the refusal to send aid was due to DeLacy's being a black woman. A review of the rescue squad calls shows that in fact no pattern of discrimination against blacks on this point in Racine can be established. On this question, I believe that Giese's failure to act was not race motivated.

Race aside, Giese has no consistent explanation for his action or, more appropriately, his failure to act. He testified that he had never before decided not to send an emergency vehicle when one was requested. He acknowledged that Hiles was coherent and DeLacy's voice showed that she was in distress. Giese testified, however, that Hiles was known to him and that he believed that Hiles was a "jerk". At a deposition Giese had testified that he did not refuse to send the ambulance on the basis that it was Hiles who had requested it. Later, however, he changed an answer on the deposition. The manner in which the change was made is as follows:

Q. Would you tell Mr. Giles the Court Reporter tonight of the change that you wish to make and the reason for the change?

A. The change is on page 18, the question is line 2. My answer to that question was "True". I believe that it should have said "False". On the day that Mr. Hiles called, I believe that I didn't send the rescue squad is because he was the caller. And I believe that just from reputation I knew he is the type of a nuisance that it was more than likely a needless type call, and I believe that's why the rescue squad wasn't sent.

At trial, Giese said he didn't know, that he couldn't explain why he hadn't sent the rescue squad. He also testified that he didn't know why he told DeLacy during *both* calls to breathe into a paper bag.[1]

I find absurd Giese's apparent belief that his refusal to send the rescue squad can somehow be justified because Hiles was the one who asked for it. It is undisputed that Hiles has a reputation in Racine: he was in the County Jail at the time of the trial; he drinks; he is described as an

---

1. The advice regarding the paper bag is not without some support. See pages 66 and 67 of Exhibit 126, the Johnson & Johnson *First Aid Book,* where the following appears on the subject of controlling hyperventilation:

# Breathing Problems
## Shortness of breath
### Controlling hyperventilation

A hyperventilating person usually responds to reassurance and to one of the following approaches:

A. Encourage the person to breathe slower and slower and to hold his breath for a few seconds before exhaling.

OR

B. Have the person breathe the same air repeatedly for 3 or 4 minutes by breathing into a paper bag held over his mouth and nose or into a bowl.

iconoclast, a character; he described himself on one of the tapes as the swimmer, which has apparently significance beyond the ordinary. Nevertheless, on the tapes he is lucid; it is clear what he wants; his voice reflects the urgency of the situation. At trial he was articulate and perfectly capable, in my view, of judging when an emergency would exist, and also perfectly capable of describing it. In addition, it should be noted that, with no difficulty, the Racine Police Department responded to his call regarding DeLacy's death.

That Giese's responses to Hiles' calls were inappropriate cannot seriously be disputed. Whether Giese's conduct was stupid, or more charitably just poor judgment, however, is not the issue. The issue is whether a constitutional claim has been presented. Has the defendant's failure to provide DeLacy with rescue services violated a constitutional duty owed to her?

A preliminary hurdle must be overcome in establishing liability against Chiapete and the City: they can be held liable only if plaintiffs can establish that the alleged violation arose from official custom or policy. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs contend that the policy of the Fire Department to answer all emergency calls was too vague to provide meaningful guidance to a dispatcher and allowed the DeLacy situation to occur.

*Monell* has spawned a number of cases which attempt to establish that allegedly unconstitutional conduct occurred, for instance, because of a city's inaction, inadequate policy, lack of supervision, or inadequate training of the individual who harmed a plaintiff. In such a case, the Supreme Court has recently decided in *City of Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791, 53 U.S.L.W. 4639 (1985), that a single incident cannot establish fault on the part of a policymaker. The failure to train employees or to take adequate action when they act improperly is distinguished from the situation in *Monell*. In *Monell*, the city had an affirm-

ative policy which in itself violated the rights of the plaintiffs; one incident in which the policy was implemented was sufficient to establish a violation. However, where, as here, a plaintiff is contending that an inadequate policy *allowed* a plaintiff's rights to be violated, a single incident will not support a claim against the policymakers. Accordingly, Chiapete, who had no personal involvement in the incident, and the City of Racine must both be dismissed for that reason alone.

As to Giese, however, the issue remains whether plaintiffs have proved a constitutional violation. In claiming that they have not, defendants rely on a number of cases, including *Ellsworth v. Racine*, 774 F.2d 182 (7th Cir.1985); *Jackson v. Joliet*, 715 F.2d 1200 (7th Cir.1983), *cert. denied*, 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720; and *Jackson v. Byrne*, 738 F.2d 1443 (7th Cir.1984). Plaintiffs rely on other cases, including *White v. Rochford*, 592 F.2d 381 (7th Cir.1979); *Bass v. Wallenstein*, 769 F.2d 1173 (7th Cir.1985); and *Duncan v. Duckworth*, 644 F.2d 653 (7th Cir.1981); and plaintiffs argue that the City of Racine, by deciding to provide emergency services to its citizens, created with them a "special relationship" constitutionally requiring Racine to provide emergency services.

Even before *Oklahoma City v. Tuttle*, *supra*, it was indisputable that it is much more difficult to establish a claim for failure to provide services than for affirmative misdeeds. A person harmed by an official's failure to act has a much greater burden than a person harmed by, say, a policeman beating him. The reason is that the Constitution is "a charter of negative rather than positive liberties." *Jackson v. Joliet, supra*, at 1203. The Constitution protects a citizen from encroachment against his person but does not require the government to shield him from harm—so much so that in *Jackson v. Joliet* the court stated:

> It is enough to note that, as currently understood, the concept of liberty in the fourteenth amendment does not include a right to basic services, whether competently provided or otherwise.

Notwithstanding, in certain cases, courts have found that the Constitution creates an affirmative duty to provide elementary protective services to specified individuals. However, in every one of the cases, the individuals entitled to services were persons with whom the state had a custodial or other "special relationship." Thus arises plaintiffs' argument here that Racine has created a special relationship with its citizens to provide emergency services.

Often the cases requiring the state to provide services involve either inmates or persons in mental institutions who are helpless to take independent measures to obtain services for themselves. *Bass v. Wallenstein, supra,* fits this mold. Bass was incarcerated at Stateville Correctional Center. At about 11:30 one night he asked for medical assistance. He asked again at 2:00 a.m., and again at 6:00 a.m. Finally, about 8:30 a.m., someone took action to help him. However, there was more bungling before Bass finally arrived at the prison hospital at 8:45 a.m. He died of cardiorespiratory arrest. A finding of liability against various prison officials was sustained.

Similarly, the state also has a duty to protect inmates of state mental hospitals from known risks of assault. *Spence v. Staras,* 507 F.2d 554 (7th Cir.1974).

In certain unique situations, officials are under a duty to protect citizens who are not institutionalized. Police officers are required to render aid to a person being beaten by fellow officers. *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972). And in *White v. Rochford, supra,* police were found liable for leaving unattended small children in a car on the Chicago Skyway in cold weather. The court determined that the actions of the police violated the due process restraint on undue incursions on personal security as well as its restraint of state activities which "shock the conscience." The case involved "gross negligence" and "reckless disregard" for the safety of the children who, the court said, the police could not avoid knowing would be subjected to dangers from both cold weather and traffic. *White* has become a case which the Court of Appeals for the Seventh Circuit consistently refers to as

one in which a special relationship exists. *See Jackson v. Byrne, supra; Ellsworth v. Racine, supra.*

However, it appears that as far as persons not in an institution are concerned, a special relationship is not easily established. *Ellsworth, supra,* was brought by a Racine undercover narcotics agent and his wife. Because of the agent's activities, his family became the target of threats "from underworld figures." Police protection was provided for Mrs. Ellsworth while her husband was working. One day she released her guards from duty and that same day she was severely beaten in the back yard of her home. The court reiterated that the fourteenth amendment does not include a right to basic public services:

> There is nothing in the Constitution which requires governmental units to act when members of the general public are in danger.

At p. 185. However, the plaintiffs tried to establish that Mrs. Ellsworth was more than a member of the general public; rather, she was said to be a person with a special relationship with the city who enjoyed a constitutional right to protection. Recognizing that the contours of a "special relationship" are hazy, the court failed to find one between Mrs. Ellsworth and the defendants.

Similarly, Joliet police had no duty to save accident victims from their burning car. *Jackson v. Joliet.* Neither did Chicago city officials have a duty to save children from a burning building. *Jackson v. Byrne.* In the latter case in fact, the court rejected a last ditch effort by the plaintiffs to argue that although a city was not constitutionally required to provide services, once it established itself as the provider of services it owed a duty to the plaintiffs to do so.

■ Rena DeLacy, personally, has no greater claim to a special relationship with Racine than do all other citizens of the city. In fact, plaintiffs do not attempt to say that DeLacy, as opposed to other citizens, has a special relationship. In that sense the claim is unlike the *Ellsworth* claim. The argument here is that because the city

has decided that it will provide emergency services to its citizens, it has a special relationship with all citizens of Racine, including Rena DeLacy. This argument has been flatly rejected. *See Jackson v. Byrne.*

Of course if the reason service is not provided is race, an equal protection violation is established. DeLacy was black. However, as I previously noted, nothing in this case convinces me that Giese failed to act because of DeLacy's race. He sent rescue squads regularly into the black community. The testimony shows that a high percentage of rescue calls in Racine are to areas with high concentrations of black citizens. That fact neutralizes any conceivable inference which might be drawn that race was a reason for Giese's failure to send the squad.

The elements of a constitutional violation are a matter of well established legal principles. The Constitution does not protect citizens against all wrongs which they suffer at the hands of state and city officials. Rescue services should unquestionably have been provided to DeLacy. The fact that they were not, however, is not a constitutional violation.

Accordingly, the action is DISMISSED.